IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RED SABRE CONSULTING, LLC, | ) | CASE NO.: 1:15-CV-01076 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE JONATHAN |
| | ) | GREENBERG |
| VERTICAL KNOWLEDGE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT A
## DEPOSITION TRANSCRIPT OF SHARON LARKIN
## TAKEN ON November 14, 2017

Respectfully submitted,

CHRISTOPHER S. WILLIAMS (0043911)
ANTHONY F. STRINGER (0071691)
KELLY A. VOYLES (0092349)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
(216) 622-8200
(216) 241-0816 — facsimile
cwilliams@calfee.com
astringer@calfee.com
kvoyles@calfee.com

*Attorneys for Defendant Vertical Knowledge, LLC.*

{04651089.DOCX;1 }

```
                                                          Page 1
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF OHIO
 3                      EASTERN DIVISION
 4  - - - - - - - - - - - - - - - - x
 5  RED SABRE CONSULTING, LLC,       :
 6                Plaintiff,         :
 7       vs.                         : Case No.
 8  VERTICAL KNOWLEDGE, LLC,         : 1:15-cv-01076
 9                Defendant.         :
10  - - - - - - - - - - - - - - - - x
11  DEPOSITION OF: SHARON L. LARKIN
12  DATE:          November 14, 2017
13  TIME:          10:01 a.m.
14  LOCATION:      Calfee Halter & Griswold
15                 1717 Pennsylvania Avenue, NW
16                 Washington, D.C.
17  REPORTED BY:   Denise M. Brunet, RPR
18                 Reporter/Notary
19
20             Veritext Legal Solutions
21          1250 Eye Street, NW, Suite 350
22             Washington, D.C.  20005
23
24
25
```

**Page 150**

1 have known how much it was due and owing in terms
2 of commissions without that information. And so
3 VK withholding that information I believe violates
4 the spirit and intent of this contract.
5   Q  Well, I'm not asking you about the spirit
6 and intent. I'm asking for you to show me where
7 in the agreement VK is obligated to inform Red
8 Sabre of funding increases.
9   A  With all due respect, that's kind of a
10 ridiculous question, because this is a commission
11 agreement, and the commissions are based on an
12 amount. So to say, where does it say in a
13 contract to disclose the amount, to me it's
14 necessarily implied.
15   Q  So it's an implied obligation?
16   A  I would say it's essential to be able to
17 perform this contract.
18   Q  I mean, the obligation is to pay Red
19 Sabre commission on invoiced dollars received.
20   A  Right. But the invoiced dollars were the
21 dollar amounts that VK told Red Sabre to invoice.
22 So one of two things needed to happen. VK needed
23 to give the correct amounts to invoice, which it
24 did not do, or disclose the funding increases so
25 that the correct amount could be calculated.

**Page 151**

1   Q  Aren't those amounts publicly available
2 information?
3   A  I don't know -- if you're saying that are
4 contract mods typically posted to FedBizOpps, yes.
5 Given what was happening with the parties, would
6 there have been any need to go to or any reason to
7 go look at contract modifications or even to guess
8 that contract modifications were occurring? No.
9 What would have --
10   Q  That wasn't my --
11   A  -- possibly have triggered an obligation
12 to go look for contract modifications? I don't
13 understand that.
14   Q  My question simply was, are not
15 modifications to these government contracts
16 publicly available information?
17       MR. WILLIGER: Objection.
18       You can answer, again.
19       THE WITNESS: Generally, at some point,
20 yes.
21 BY MR. STRINGER:
22   Q  It's your opinion that the GSA contract
23 constitutes an ongoing project under the parties'
24 sales and revenue agreements? That's your opinion
25 in this case?

**Page 152**

1   A  Is it my opinion -- can you repeat that?
2   Q  Sure. It's your opinion in this case
3 that the GSA contract constitutes an ongoing
4 project under the parties' sales and revenue
5 agreements?
6   A  Yes.
7   Q  And that opinion is based on your
8 interpretation of the parties' sales and revenue
9 agreements?
10   A  It's based on my review of that agreement
11 as well as the J&A and as well as the GSA, the
12 DISA contracts, the evidence that I looked at.
13 It's based on my understanding of the facts, my
14 expertise as well.
15   Q  Part of which includes your
16 interpretation of the parties' sales and revenue
17 agreements, true?
18   A  It's looking at the contracts and
19 applying it to the facts as I see them and have
20 evaluated them.
21   Q  Right. But that necessarily includes how
22 you interpret the parties' sales and revenue
23 agreements, does it not?
24   A  It's based on my understanding of what
25 this document requires and how the parties

**Page 153**

1 operated under it.
2   Q  What's your interpretation of the
3 agreement?
4       MR. WILLIGER: Objection. She's answered
5 the question a number of times.
6       THE WITNESS: Yeah. I don't know how I
7 can answer --
8 BY MR. STRINGER:
9   Q  Well, let me ask you this --
10   A  -- any differently than I am.
11   Q  -- do you think that the parties' sales
12 and revenue agreements in terms of the revenue
13 sharing program in those agreements are
14 unambiguous?
15   A  I do not. Wait. Wait. You said
16 unambiguous or --
17   Q  Unambiguous.
18   A  They're clear. So without the double
19 negatives here --
20   Q  Right.
21   A  -- they are clear. They are not
22 ambiguous.
23   Q  Okay. So it's your testimony that the
24 parties' sales and revenue agreements, the revenue
25 sharing part of those agreements, are not

Page 154

1 ambiguous?
2     MR. WILLIGER: Asked and answered.
3     Go ahead.
4     THE WITNESS: I'm tripping over --
5 BY MR. STRINGER:
6  Q  Not ambiguous, that they're plain;
7 they're clear.
8  A  Yes.
9  Q  You don't see ambiguity in the revenue
10 sharing program?
11  A  I do not.
12     (Whereupon, at 1:27 p.m., a lunch recess
13 was taken.)

Page 155

1     AFTERNOON SESSION
2         (2:03 p.m.)
3 Whereupon,
4     SHARON L. LARKIN,
5 was called for continued examination, and having
6 been previously duly sworn was examined and
7 testified further as follows:
8     EXAMINATION BY COUNSEL FOR DEFENDANT
9 BY MR. STRINGER:
10  Q  You know, I meant to ask earlier, where
11 do you live?
12  A  Annapolis, Maryland.
13  Q  And how long have you lived in Annapolis?
14  A  Since 2013.
15  Q  How long have you been in the D.C. area?
16  A  Since 1998.
17  Q  Have you ever practiced law outside of
18 D.C.?
19  A  No.
20  Q  Back to your report, page 9, that first
21 paragraph. I'm sorry -- page 9 of your report.
22  A  Okay.
23  Q  You state, "The GSA contract is based on
24 the initial development of the IV2 project under
25 the initial JCTD effort and follow-on DISA

Page 156

1 contract."
2  A  Where are you looking?
3  Q  Do you see that sentence?
4  A  Yes, I do.
5  Q  And what is that sentence based on?
6  A  The J&A.
7  Q  Anything other than the J&A?
8  A  The general scope of the GSA contract.
9  Q  All right. So that sentence is based on
10 the J&A which, for the record, is the
11 justification and approval document?
12  A  Yes.
13  Q  And then also the scope of services
14 contained in the contract.
15  A  Which talks -- the general scope and
16 purpose has reference -- I'd like to see that,
17 because it has some references there that made me
18 think similarities between DISA and GSA contracts,
19 but this particular statement about the initial
20 development of the IV2 being a basis -- let me
21 just restate it this way: This sentence stating
22 that the GSA contract is based on the initial
23 development of the IV2 project under the initial
24 JCTD effort and follow-on DISA contract -- my
25 recollection is that it's largely from the J&A.

Page 157

1 The J&A has a pretty comprehensive discussion of
2 the evolution that led to the GSA contract.
3  Q  Is there anything contained in the actual
4 GSA contract that would support that sentence?
5  A  I'd have to look at the GSA contract.
6  Q  As you sit here -- not sure, as you sit
7 here right now?
8  A  It's not that I'm not sure. The contract
9 itself is a very, very large document. And so I'd
10 want to take a look at it. I did, as I recall, a
11 comparison analysis between not only the J&A, but
12 also discussing the various general scopes of
13 work. So --
14  Q  Where is that contained in your report?
15 We know that the J&A is page 11 and 12 -- right?
16 Your 11 and 12 is from the J&A?
17  A  That's correct. Talking about, on 13 and
18 14, doing some analysis of the other types of
19 overlap and similarities and connections between
20 the DISA and GSA contract.
21  Q  Okay. We've established that the DISA
22 contract was a follow-on project, correct?
23  A  Yes. Ongoing project is the language of
24 the --
25  Q  Correct. That's fair enough. So the